[Cite as *In re T.W.*, 2012-Ohio-5938.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# ALLEN COUNTY

IN THE MATTER OF:

    T.W.,

ALLEGED DELINQUENT CHILD.

CASE NO. 1-12-16

**O P I N I O N**

Appeal from Allen County Common Pleas Court
Juvenile Division

Trial Court No. 2011 JG 28838

**Judgment Affirmed**

Date of Decision: December 17, 2012

APPEARANCES:

    *Cheryl R. Washington* for Appellant

    *Jordan J. Grant* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, T.W., appeals the Allen County Court of Common Pleas Juvenile Division's judgment finding her delinquent for the offense of disorderly conduct following an adjudicatory hearing. T.W. argues her finding of delinquency is the result of an unconstitutional seizure and unlawful arrest, and that her finding of delinquency is against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶2} The present case stems from an incident that occurred on September 20, 2010. (Tr. at 4). Officers were called to the scene at the intersection of Elizabeth and Kibby Streets in Lima, Ohio to investigate an alleged fight that had occurred while a large group of middle school children were walking home from school. (*Id*. at 5). When the officers arrived, they observed the group of children but did not see any evidence of a fight. (*Id*. at 10). As one of the officers left, T.W. held up her two middle fingers towards the officer and a group of children on the other side of the street. (*Id*. at 11). It was initially unclear to the officer whether the gesture was directed towards him or the other children. (*Id*. at 12). The officer stopped to discuss the incident with T.W., but she refused to cooperate. (*Id*. at 12-13). After repeatedly requesting that T.W. stop walking away from him and T.W. refusing to comply, the officer arrested T.W. (*Id*.). Upon and following her arrest, T.W. used profane and abusive language towards

the officers she encountered, and threatened violence towards them and their families. (*Id*. at 14-18, 45, 82).

{¶3} On July 11, 2011, a complaint was filed against T.W. alleging she was a delinquent child for committing the offense of obstructing official business in violation of R.C. 2921.31(A), a misdemeanor of the second degree if committed as an adult, and persistent disorderly conduct in violation of R.C. 2917.11(A)(2)(E)(3)(a), a misdemeanor of the fourth degree if committed as an adult. (Doc. No. 1).

{¶4} The juvenile court held a pre-trial hearing on August 17, 2011. (Doc. No. 8). At that time, T.W. denied the allegations contained in the complaint. (*Id*.).

{¶5} On January 11, 2012, the matter came before the juvenile court for an adjudicatory hearing. (Doc. No. 20). The juvenile court filed its judgment entry on January 27, 2012, finding that T.W. was a delinquent child due to persistent disorderly conduct, but finding that T.W. was not a delinquent child as a result of obstructing official business. (*Id*.).

{¶6} The juvenile court held a dispositional hearing on March 8, 2012. (Doc. No. 22). On March 12, 2012, the juvenile court filed its judgment entry placing T.W. on community control for 90 days monitored time, ordering her to perform six hours of community service, and ordering her to pay court costs. (*Id*.).

{¶7} On April 6, 2012, T.W. filed a notice of appeal. (Doc. No. 24). T.W. now raises three assignments of error for our review. For the purposes of our discussion, we will address T.W.'s first two assignments of error together.

**Assignment of Error No. I**

**Trial court erred in mischaracterizing the encounter preceding appellant's arrest as "consensual," as the encounter constituted an illegal pursuit, detention and seizure in violation of appellant's rights under the Ohio and United States Constitutions.**

**Assignment of Error No. II**

**Trial court erred in determining that appellant [T.W.] had been legally arrested when police officers apprehended and handcuffed her, as the arrest was unlawful and accomplished in violation of appellant's Fourth Amendment rights.**

{¶8} In her first two assignments of error, T.W. argues the police officers violated her Fourth Amendment rights by illegally arresting her. In her first assignment of error, T.W. argues her encounter with the arresting officer was not consensual and that the officer illegally restrained her when she attempted to leave. T.W. further contends that the officer stopped her in retaliation for her raising her middle fingers towards him, and that the officer's action violated her First Amendment rights. In her second assignment of error, T.W. argues that her gesture did not establish probable cause for her arrest. T.W. contends that since the officer did not have probable cause, her arrest was unlawful.

{¶9} As an initial matter, we note that T.W. failed to file a motion to suppress challenging the lawfulness of her arrest. Consequently, she raises these arguments for the first time on appeal. Crim. R. 12 requires a defendant to file a motion to suppress to challenge illegally obtained evidence. *State v. Gilbert*, 7th Dist. No. 08 MA 206, 2012-Ohio-1165, ¶ 80; *State v. Martinez*, 4th Dist. No. 91 CA 1, *6 (Sept. 28, 1992). "A motion to suppress is the proper vehicle for raising challenges based on violations of the Fourth, Fifth and Sixth Amendments." *Gilbert* at ¶ 80. If a defendant does not file a motion to suppress, she has waived all but plain error on appeal. *State v. Wallace*, 3d Dist. No. 14-10-20, 2011-Ohio-1728, ¶ 8; *State v. Burgett*, 3d Dist. No. 9-09-14, 2009-Ohio-5278, ¶ 37.

{¶10} We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 110 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of her trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990).

{¶11} We cannot find plain error in the present case. "[T]he proper remedy for a Fourth Amendment violation is suppression of the evidence wrongfully obtained, not dismissal of the charges." *Blanchester v. Hester*, 81 Ohio App.3d 815, 820 (12th Dist.1992). Even an unlawful or illegal arrest does not excuse subsequent criminal conduct. *State v. Sears*, 4th Dist. No. 624, *3 (Oct. 1, 1990). "[W]here a person who is being arrested commits a new crime during or after the arrest, the conduct witnessed that constitutes the new crime need not be suppressed merely because the initial arrest, which may be the motive for the new crime, turns out to be unlawful." *State v. Ali*, 7th Dist. No. 02 BE 46, 2003-Ohio-5150, ¶ 11. *See also State v. Cossack*, 7th Dist. No. 03-MA-263, 2005-Ohio-965, ¶ 26-27; *City of Akron v. Holmes*, 9th Dist. No. 21590, 2004-Ohio-832, ¶ 14.

{¶12} The Seventh District Court of Appeals addressed this issue in depth in *State v. Ali*, 2003-Ohio-5150. In that case, police officers responded to an anonymous call that a black vehicle with Virginia license plates was located at a local Belmont County gas station. *Id*. at ¶ 2. The caller expressed concern regarding "three subjects that appeared to be dressed in some Arabian garb clothing with their faces covered and masks on." *Id*. The responding officer followed the vehicle and initiated a traffic stop. *Id*. After waiting for backup, the officer ordered the occupants out of the vehicle with a loudspeaker, instructed them to get onto the ground, and the officers eventually frisked and handcuffed the

individuals. *Id*. at ¶ 2. The defendant threatened the officers, telling them that she was going to kill them. *Id*. at ¶ 3. The defendant was charged with ethnic intimidation, resisting arrest, and aggravated menacing. *Id*. at ¶ 4. The trial court concluded that the officers lacked probable cause to arrest the defendant, but refused to suppress the statements that were the basis for the aggravated menacing charge because they were separate criminal acts. *Id*. at ¶ 4-5.

{¶13} The Seventh District affirmed the defendant's ultimate conviction for aggravated menacing, determining that the evidence of aggravated menacing that occurred during or after the unlawful arrest "need not be suppressed because such menacing is a separate and independent criminal act engaged in by the defendant rather than merely evidence that is already in existence at the time the unlawful arrest is made." *Id*. at ¶ 18. The Seventh District reasoned, that "if appellant had drugs on her person or in her car, the drugs would be suppressed due to the illegality of the search and seizure." *Id*. at ¶ 11. The Court distinguished this evidence from evidence of subsequent criminal activity, stating, "[o]n the other hand, if appellant had shot and killed a police officer during her arrest, this conduct would not be suppressed based upon the illegal arrest." *Id*. Thus, the Seventh District held that evidence regarding a new crime that is committed during or after an arrest need not be suppressed simply because the initial arrest was unlawful. *Id*.

{¶14} The Second District Court of Appeals has applied the same reasoning in the case of a defendant assaulting an officer in response to an unlawful arrest, stating that "where the officers lacked cause to effectuate an original arrest yet where the accused responded to an illegal arrest by physically attacking the officer, the evidence of this new independent crime is admissible." *State v. Roberts*, 2d Dist. No., 23219, 2010-Ohio-300, ¶ 22. This ruling is consistent with this Court's previous case law, where we have stated that the fruit of the poisonous tree doctrine or derivative evidence rule "does not require the exclusion of all evidence that might not have been discovered 'but for' the illegal actions of the police." *State v. Pearson*, 130 Ohio App.3d 577, 584 (3d Dist.1998). Rather, "[t]he rule only operates to exclude derivative evidence that is discovered as a result of a constitutional violation." *Id.*

{¶15} In the present case, the alleged acts that form the basis for T.W.'s delinquency for persistent disorderly conduct occurred during and subsequent to her arrest, and thus are not previously existing evidence that was discovered as a result of a constitutional violation. "An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244 (1980). Consequently, even if this Court were to agree with T.W. that her initial arrest was unlawful, that finding would not result in the reversal of her delinquency finding

since her allegedly illegal conduct occurred during and subsequent to her arrest and could constitute an independent crime of persistent disorderly conduct. As a result, this Court does not find plain error requiring the reversal of T.W.'s conviction based on the allegedly illegal arrest.

{¶16} T.W.'s first and second assignments of error are, therefore, overruled.

### Assignment of Error No. III

**Appellant's adjudication as a delinquent child is against the manifest weight and sufficiency of the evidence.**

{¶17} In her third assignment of error, T.W. argues her conviction is against the manifest weight and sufficiency of the evidence. T.W. contends that her profane language was free speech protected by the Fourth Amendment. T.W. further argues that although her speech was obscene, it did not constitute "fighting words" that would incite a reasonable police officer to respond with violence. T.W. also contends that since she was unable to presently fulfill her threats to the police officers, they could not have been reasonably alarmed.

{¶18} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶19} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d 89, 684 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶20} T.W. was found delinquent for persistent disorderly conduct in violation of R.C. 2917.11(A)(2), which provides:

No person shall recklessly cause inconvenience, annoyance, or alarm

to another by doing any of the following:

* * *

(2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person * * *.

**{¶21}** The Supreme Court of Ohio has held that offensive speech is not a crime unless it rises to the level of fighting words. *Cincinnati v. Karlan*, 39 Ohio St.2d 107, 109-110 (1974). The Court has defined fighting words as words that, "by their very utterance inflict injury or are likely to provoke the average person to an immediate retaliatory breach of the peace." *Id.* "In determining whether language rises to the level of 'fighting words,' courts look at the circumstances surrounding the words." *Middletown v. Carpenter*, 12th Dist. No. CA2006-01-004, 2006-Ohio-3625, ¶ 14, citing *Hamilton v. Johnson*, 12th Dist. No. CA99-02-025, *4 (Dec. 3, 1999). This Court has previously held that we must review the standard objectively and determine whether a reasonable person would be provoked to breach the peace. *State v. White*, 3d Dist. Nos. 3-97-18, 3-97-19, *4 (Apr. 21, 1998).

**{¶22}** This Court has stated, "the fact that an officer is the person to whom the comments were directed has no bearing on our evaluation." *Id.*; *See also State v. Baker*, 3d Dist. Nos. 9-88-8, 9-88-9, *3 (Sept. 19, 1989). However, other Courts have held that the fact that the statements were directed to an officer is an important part of the analysis. *Carpenter* at ¶ 15. For example, some district

-11-

courts of appeals have held that profane words intentionally directed towards a police officer are likely to constitute fighting words, while inappropriate commentary about the situation do not. *Hamilton v. Johnson*, 12th Dist. No. CA99-02-025, *4 (Dec. 3, 1999); *State v. Beamer*, 5th Dist. No. 11CA14, 2012-Ohio-2222, ¶ 11; *Warrensville Heights v. Brown*, 8th Dist. No. 89346, 2008-Ohio-126, ¶ 14.

{¶23} Courts have found that words directed towards a police officer that constituted fighting words included, "What are you going to do asshole pig, You going to arrest me?" and "I hate all of you fucking prick-ass cops * * * get out of my way you fucking prick-ass cops." *State v. Dickey*, 75 Ohio App.3d 628, 630 (11th Dist.1991); *Karlan*, 39 Ohio St.2d, at paragraph three of the syllabus. In contrast, courts have held that words directed towards a police officer were not fighting words when they were a vulgar commentary about the situation, such as "stay away from the fucking door, get the fuck out of here," "the police are worthless, this is f[ucking] bullshit," and "go ahead, tow the motherfucker." *Kent v. Kelley*, 44 Ohio St.2d 43, 43 (1975); *Toledo v. Grince*, 48 Ohio App.3d 126, 127 (6th Dist.1989); *State v. Lamm*, 80 Ohio App.3d 510, 514 (4th Dist.1992).

{¶24} During the adjudicatory hearing in the present case, Officer Nate Garlock, the arresting officer, testified that as he was driving away from the scene, T.W. held up her two middle fingers towards either him or another group of

children. (Tr. at 11). Officer Garlock testified that he approached T.W. and put his hand on her shoulder, and she said, "[g]et the fuck off of me." (*Id*. at 14). Officer Garlock testified that T.W. continued to use profane language towards him, "[t]here was a lot of 'fuck you's' and she called us 'bitches' a lot and it was a bunch of different terms." (*Id*. at 16). Officer Garlock testified that he was alarmed by T.W.'s behavior, and that "she was very out of control." (*Id*. at 15). Officer Garlock testified that he told T.W. to stop her behavior, but that "[s]he didn't stop, but just kept going, she continued to tell us that she didn't have to listen to us." (*Id*. at 16).

{¶25} Officer Matthew Woodworth assisted Officer Garlock at the scene. (*Id*. at 44). Officer Woodworth testified that while Officer Garlock was arresting T.W., she was yelling profanities at the officers and calling them "any name in the book." (*Id*.). Officer Woodworth testified that he transported her to the police station, and that while T.W. was in the car, "she was cursing at me, saying 'fuck you', called me a pedophile, said she was going to have family members find myself and Patrolman Garlock * * * ." (*Id*. at 45). Officer Woodworth testified that he was alarmed when T.W. threatened to kill him. (*Id*.). Officer Woodworth testified that when they reached the police station, "[s]he was still yelling and cursing * * *." (*Id*. at 47).

{¶26} Officer Dustin Brotherwood was working at the front desk when T.W. arrived at the police station. (*Id*. at 67-68). Officer Brotherwood testified that when the officers brought T.W. into the station, she was screaming obscenities, "[m]ultiple times, get your fucking hands off me, and kept screaming these words over and over. As they got her up to me, she continued to yell." (*Id*. at 68). Officer Brotherwood testified that he was alarmed by T.W.'s behavior because she was very aggressive towards the officers. (*Id*. at 68-69). Officer Brotherwood testified that, "[a]s I was trying to remove the handcuffs, she was still being very vulgar with us, calling us racist bastards, cussing and saying fuck multiple times to us." (*Id*. at 69).

{¶27} Sergeant Beverly Leary testified that she stopped by T.W.'s holding cell because she heard her yelling. (*Id*. at 80). Sergeant Leary testified that she attempted to talk to T.W., and T.W. replied, "fuck you, you white bitch." (*Id*. at 81). Sergeant Leary asked T.W. her name and age, "[a]nd it was fuck you. And, then she got up off the bench, and she said if I didn't have these handcuffs on, I would slap the white off your face until it turned black." (*Id*. at 81-82). Sergeant Leary testified that T.W. "continued to cuss and she said, she would kill all of us." (*Id*. at 82). Sergeant Leary testified that she was alarmed by T.W.'s threats to kill the officers. (*Id*.).

-14-

{¶28} Regardless of which standard this Court applies to the present case, T.W.'s delinquency is not against the manifest weight of the evidence or supported by insufficient evidence. The evidence established that T.W. directed a stream of profane and abusive language towards the officers, made racially charged statements such as calling them "white racists," and made violent threats to the officers and their families. (Tr. at 16, 44, 45, 47, 68, 81-82). Thus, there is competent, credible evidence showing that a reasonable person would be incited to breach the peace in response to T.W.'s statements, and a rational trier of fact could have determined T.W. was guilty of persistent disorderly conduct.

{¶29} The evidence also shows that the statements were more than an inappropriate commentary about the situation, but rather, a personal attack on the officers. T.W. called one officer a pedophile, another officer a "white bitch," and threatened to "slap the white off [her] face." (Tr. at 45, 81-82). The officers testified that they were alarmed by T.W.'s threats of violence and her aggressive behavior towards them. (Tr. at 15, 45, 68, 82). The Supreme Court of the United States has stated, that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502 (1987). However, we cannot find that the verbal criticism includes threats of violence to kill the officers and their families. *See State v. McMullen*, 5th Dist. No. 04CA107, 2005-Ohio-3542, ¶ 21 ("[W]e find the

words used by appellant, coupled with his actions and out of control attitude, were 'fighting words' or a threat to do physical violence.").

**{¶30}** T.W. argues that her threats did not constitute disorderly conduct because she was restrained and presently unable to carry them out. However, R.C. 2917.11(A)(2) does not require the offender to be capable of fulfilling the threatened action, but only to cause "inconvenience, annoyance, or alarm," which the officers testified occurred here. As a result, there is competent, credible evidence supporting T.W.'s delinquency for persistent disorderly conduct and a reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

**{¶31}** T.W.'s third assignment of error is, therefore, overruled.

**{¶32}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the juvenile court.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**

**ROGERS, J., concurs in Judgment Only.**

**/jlr**