[Cite as *State v. Giannini*, 2026-Ohio-1888.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No. E-25-026

       Appellee                              Trial Court No. CRB-25-00062

v.

Christopher A. Giannini                     **DECISION AND JUDGMENT**

       Appellant                             Decided: May 22, 2026

* * * * *

Kevin J. Baxter, Esq., Prosecutor and
Kristin R. Palmer, Esq., Assistant Prosecutor, for appellee.

Karin, L. Coble, Esq., for appellant.

* * * * *

**SULEK, J.,**

{¶ 1} Defendant-appellant, Christopher Giannini, appeals a judgment of the Erie

County Municipal Court which, following a jury trial finding him guilty of assault,

sentenced him to a 90-day jail sentence, 88 days suspended, and a $500 fine.  Because the

conviction is supported by sufficient evidence and is not against the manifest weight of the evidence, it is affirmed.

## I. Facts and Procedural History

{¶ 2} On April 7, 2025, the State filed a complaint charging Giannini with one count each of domestic violence and assault, first degree misdemeanors. The charges stemmed from an incident on April 6, 2025, where Giannini forcefully shoved past S.F,[1] a household member, while exiting the house. S.F. sustained an abrasion and contusion.

{¶ 3} Giannini pleaded not guilty to the charges. On June 25, 2025, the State moved to dismiss the domestic violence count; the court dismissed the count without prejudice. The matter proceeded to a jury trial where the parties presented the following relevant evidence.

{¶ 4} Erie County Sheriff's Sergeant Brett Szakats testified that on April 6, 2025, he and Deputy Opfer were dispatched to a residence where the 911 caller's father was not allowing her into the residence. They responded to the home in Milan Township, Erie County, Ohio, and spoke with S.F. who was standing by her vehicle in the driveway. She indicated that she was permanently vacating the residence and wished to enter to collect her remaining belongings.

{¶ 5} Sergeant Szakats wore and operated his body worn camera (BWC) during the incident; the recording was played for the jury and admitted into evidence. The State

---

[1]The transcript and parties refer to the victim as C.F.; however, the trial exhibits include her signature and evidence that S.F. is the correct spelling.

2.

presented Szakats with a document Giannini is seen handing him in the video. The document was an agreed judgment entry, dated January 17, 2025, dismissing a civil protection action instituted by Giannini and giving S.F. 90 days to move out of the residence. The document was admitted into evidence.

{¶ 6} Sergeant Szakats explained that S.F. was adamant about obtaining the rest of her items that day. At one point, S.F. retrieved a baseball bat from her vehicle and stated her intent to use it to gain access to the residence. She ultimately gained entry through a basement window.

{¶ 7} Minutes later the BWC recording shows S.F. on the walkway connecting the driveway and the front porch trying to catch three loose dogs. S.F. walked back up to the open doorway calling the dogs. Giannini then appears behind her, runs into the back of her forcing her off the porch. Szakats stated that Giannini ran into "[S.F.] with enough force to at least knock her over and made her off-balance" and she sustained an injury. Giannini then ran up to the officers in the front yard and they placed him under arrest. He stated: "I just pushed her." S.F. informed Sergeant Szakats that she hit the doorframe and he observed redness and bruising to S.F.'s left shoulder blade area.

{¶ 8} During cross-examination, Sergeant Szakats agreed that S.F. refused medical treatment and that the injury could have been sustained earlier while moving her belongings. He acknowledged that initially, only one dog was outside and that S.F. stepped aside with the door open and two more dogs ran out. He asked S.F. to come get the dogs and she made no real effort to comply.

3.

{¶ 9} S.F. testified that for the past 12 to 13 years, Giannini was like a foster father to her and she lived in his home off and on for several years. On April 6, 2025, after S.F. called 911, she waited in her car for the police. Two officers arrived and went inside to talk with Giannini. They returned telling her there was not much they could do because it was a civil matter. S.F. tried to enter but the doors were locked. She went to her car and retrieved a baseball bat intending to use it to break a window, if necessary. She entered the home after breaking a screen on the lower level where her bedroom was located.

{¶ 10} S.F. recorded a video of the incident on her cell phone which she narrated. After realizing that her dog was loose, she got a bag of Oreos from the pantry and went on the front porch. She then stated "you hear Chris from behind me and told me to move and I told him no. And then he shoves me into the side of the house that's right on the porch and I dropped some cookies." The shove caused a red mark which later turned into a bruise. Two photographs depicting S.F.'s injury were admitted into evidence.

{¶ 11} An indoor security camera recording, admitted into evidence, provided a rear-facing view of the incident. S.F. again narrated that she was standing in the doorway calling her dog who was loose in the front yard along with Giannini's two dogs. Giannini came up from behind telling her to get out of the way. S.F. did not have time to move because she "didn't expect him to actually charge through [her]."

{¶ 12} During cross-examination, S.F. admitted that on the date of the incident she smoked marijuana in Giannini's home which made him upset. She acknowledged that Giannini obtained a Civil Stalking Protection Order (CSPO) against her and that when

4.

deputies initially served the order, they removed her from the house.  In January 2025, she and Giannini reached an agreement where she was given 90 days to vacate Giannini's home.

{¶ 13} S.F. admitted that on the day of the incident Giannini's dogs ran out the front door after she left it open.  She stated that it was not her concern and she only cared about getting her dog back in the house.   S.F. agreed that Giannini twice told her to move out of the doorway and she refused; she stated she had no intention of moving.

{¶ 14} S.F. had been moving out over the course of several weeks and in March 2025, she damaged a door in the home after slamming it because she was angry.

{¶ 15} At the conclusion of the State's case, defense counsel moved for a directed verdict under Crim.R. 29; the court denied the motion.

{¶ 16} Three witnesses testified on Giannini's behalf.   Erie County Sheriff's Lieutenant Trevor Harlow testified that on March 8, 2025, he responded to a disturbance at Giannini's home.  Giannini reported that S.F. was being "turbulent" and slammed and damaged a door.  Giannini appeared discouraged over his living situation.

{¶ 17} Erie County Sheriff's Deputy Ryan Opfer responded to the April 2025 call and, like Sergeant Szakats, his BWC recorded the incident.  Deputy Opfer reviewed the CSPO paperwork the Giannini handed him.  After leaving the house he observed the dogs loose in the front yard and Giannini coming out of the doorway.  He agreed that prior to the incident he did not see what, if anything, transpired between Giannini and S.F. inside the house.

5.

{¶ 18} Giannini's expert, John Majoy, testified that he is the police chief for the village of Middleburg Heights near Cleveland, Ohio. He was a professor of criminal justice at Bowling Green State University and is an adjunct professor of criminal justice at Tiffin University. Majoy previously served as police chief for the city of Huron, Ohio, and held positions of sergeant, and patrol officer. Majoy also sits on the Ohio Victim's Assistant Advisory Board and the Cuyahoga County Domestic Violence Task Force.

{¶ 19} Preparing an expert report, Majoy reviewed the police report from April 6, the BWC recordings, the home security camera footage, and excerpts from the Erie County Sheriff's policy manual. Majoy testified to three screen shots taken from the security footage depicting S.F. in the open doorway and what he believed was her attempt, based on her posture, to block Giannini from exiting.

{¶ 20} Majoy felt that "standard police practice" dictated that the responding deputies mediate the situation instead of remaining hands off. Their statements that they could not stop S.F. from breaking into the home could have been construed as encouraging her to do so. He believed that the officers could have peacefully resolved the situation.

{¶ 21} The State cross-examined Majoy on the photo he thought depicted S.F. intentionally blocking Giannini's egress. Three photos were taken over the course of two seconds. The first two, as Giannini approaches, show S.F.'s arms at her side and her legs close together, the third shows her right arm lifted and her stance widened. Majoy agreed that an individual unexpectedly touched from behind would have some sort of a physical

6.

reaction. Majoy admitted to a professional relationship with Giannini and that he supported Majoy's campaign for sheriff in 2012.

{¶ 22} Giannini rested and the trial court denied his renewed Crim.R. 29 motion for acquittal. Following deliberations, the jury found Giannini guilty of assault. This appeal followed.

## II. Assignment of Error

{¶ 23} Giannini raises one assignment of error for review:

> Assignment of Error One: The verdict was unsupported by sufficient evidence and was therefore a violation of Due Process as guaranteed by the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution; the conviction is also against the manifest weight of the evidence.

## III. Analysis

{¶ 24} In his sole assignment of error, Giannini argues that jury's verdict convicting him of assault was not supported by sufficient evidence and was against the weight of the evidence. Giannini claims that because he was only trying to get past S.F. to retrieve his dogs, he lacked the requisite knowing intent.

{¶ 25} In determining whether a verdict is supported by sufficient evidence "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. In making this determination, appellate courts do not weigh the

7.

evidence or assess the credibility of witnesses. *State v. Harris*, 2024-Ohio-4722, ¶ 15

(6th Dist.), citing *State v. Walker*, 55 Ohio St.2d 208, 212 (1978).

{¶ 26} Giannini also argues that his conviction was against the manifest weight of

the evidence. When reviewing a manifest weight claim, "'[t]he court, reviewing the

entire record, weighs the evidence and all reasonable inferences, considers the credibility

of witnesses and determines whether in resolving conflicts in the evidence, the jury

clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed and a new trial ordered.'" *State v. Lang*, 2011-Ohio-4215, ¶ 220,

quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "'The discretionary power to

grant a new trial should be exercised only in the exceptional case in which the evidence

weighs heavily against the conviction.'" *Id.*, quoting *Thompkins* at 387.

{¶ 27} The jury convicted Giannini of assault, R.C. 2903.13(A), which prohibits a

person from knowingly causing or attempting to cause physical harm to another. A

person acts knowingly where he is aware that his conduct will probably cause a certain

result. R.C. 2901.22(B).

> The prosecution is not required to show that the defendant intended the end result to prove that he acted "knowingly." *State v. Turner*, 2024-Ohio-684, ¶ 90 (2d Dist.); R.C. 2901.22(B). Instead, the prosecution must show that the defendant acted with awareness that the conduct will probably cause such harm. *State v. Chambers*, 2024-Ohio-3341, ¶ 181 (6th Dist.). In other words, "it is only necessary that the result is within the natural and logical scope of risk created by the conduct[.]" *Turner* at ¶ 90, citing *State v. Pierce*, 2023-Ohio-528, ¶ 24 (8th Dist.).

8.

{¶ 28} *State v. Pettaway*, 2025-Ohio-2260, ¶ 42 (6th Dist.); *In re Mark M.*, 2000 WL 125800, *3 (6th Dist. Feb. 4, 2000). "Absent an admission, whether a person acts knowingly may be determined solely from the surrounding facts and circumstances, including the doing of the act itself." *State v. Jasso*, 2023-Ohio-209, ¶ 27 (6th Dist.), citing *State v. Hendricks*, 2020-Ohio-5218, ¶ 19 (6th Dist.), citing *In re S.C.W.*, 2011-Ohio-3193, ¶ 18 (9th Dist.). It is a subjective determination, decided on objective criteria. *Id.,* citing *Hendricks* at ¶ 19.

{¶ 29} Giannini relies on *State v. Lillie*, 2018-Ohio-2714 (5th Dist.), *State v. Kemper*, 2012-Ohio-5958 (12th Dist.), and *Mark M.*, where the courts overturned assault convictions finding insufficient evidence of intent.

{¶ 30} *Lillie* involved an incident where the defendant and a humane society worker simultaneously tried to catch the defendant's loose dog when the defendant pushed the worker on the shoulder. *Id.* at ¶ 3. The worker neither fell nor sustained injury. *Id.* When police arrived, the defendant told them he was agitated because the humane society had taken his dog and that he lightly pushed the worker. *Id.* at ¶ 4. Following a bench trial, the court found the defendant guilty of attempted assault. *Id.* at ¶ 7. Reversing, the court of appeals, relying on *Kemper*, concluded that the defendant's contact with the worker was an attempt to block her from accessing his dog, not to cause harm. *Id.* at ¶ 15.

{¶ 31} In *Kemper*, the court of appeals, in a split decision, reversed the defendant's assault conviction based on insufficient evidence of intent. Trying to get his

9.

belongings from a house and the victim trying to prevent him, the defendant "shoved" the victim two times which involved him placing his hands on the victim's shoulders and moving her to the side. *Id.* at ¶ 3, 15. The victim was not injured. *Id.* at ¶ 15. The court concluded that there was "insufficient evidence to establish that [the defendant] was aware that placing his hands on [the victim's] shoulder to move her aside would probably cause a certain result, mainly physical harm." *Id.* at ¶ 17.

{¶ 32} Finally, in *Mark M.*, this court reversed an assault conviction where the defendant pushed a teacher out of the way to access a student who made a derogatory remark. *Id.* at *1. The court concluded that the defendant intended to move the teacher "without regard to whether such physical encounter would cause harm," and that the intent element had not been satisfied. *Id.* at *3.

{¶ 33} Here, it is undisputed that the parties had a contentious history which included the events directly leading up to the incident. The State presented the testimony of Sergeant Szakats that Giannini ran into S.F. with enough force to knock her over and that he observed S.F.'s injuries. Additionally, the BWC recording and the home security footage depict Giannini quickly and purposely walking toward the door while telling S.F. to get out of the way and then shoving her. The State also submitted photos of abrasions on S.F.'s back which S.F. stated Giannini caused by pushing her into the doorframe. Giannini also admitted he pushed S.F. Thus, unlike the facts in *Lillie*, *Kemper*, or *Mark M.*, when viewing the evidence presented in this case in a light most favorable to the State, Giannini's conviction is supported by sufficient evidence.

10.

**{¶ 34}** Giannini also claims that his assault conviction was against the weight of the evidence demonstrating that he did not act with intent to cause S.F. physical harm rather, he acted to prevent injury to his dogs. Again, reviewing the evidence before the jury, particularly the responding officer's testimony and the security video from within the house, this is not an exceptional case where the evidence weighs heavily against the conviction. As previously stated, the home security video shows Giannini quickly striding toward the front door while ordering S.F. to get out of his way, then shoving her to the side as he continued out the door. He did not merely "move her aside to protect his property" as Giannini asserts. After officers placed him under arrest, Giannini admitted that he pushed her.

**{¶ 35}** Accordingly, because Giannini's assault conviction was supported by sufficient evidence and was not against the weight of the evidence it is affirmed. Giannini's assignment of error is not well-taken.

## IV. Conclusion

**{¶ 36}** Upon due consideration, the judgment of the Erie County Municipal Court is affirmed. Pursuant to App.R. 24, Giannini is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Charles E. Sulek, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.